# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | |
| V. | § § | CASE NO. 4:09-CR-37(1) |
| | § | Judge Crone/Judge Mazzant |
| RONALD WAYNE RICHARD, JR. (1) | § | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Pending before the Court is Defendant's Motion to Suppress Evidence (Dkt. #110). Having considered the relevant pleadings, and argument and testimony given at the June 18, 2009 hearing, the Court is of the opinion that Defendant's motion should be denied.

## BACKGROUND

Defendant seeks to suppress the discovery of approximately $30,000 discovered inside a nail gun found in the trunk of his vehicle after his arrest by Drug Enforcement Administration ("DEA") agents and officers of the Mesquite Police Department on February 23, 2009. Defendant also seeks suppression of all statements, either written or oral, made after the arrest. While Defendant's written motion makes no references to any specific facts of the case, at the hearing before the Court, Defendant argued that the arrest in this case was made without probable cause and that the subsequent search of his vehicle violated his Fourth Amendment rights. Defendant also asserts that his alleged statements given subsequent to the arrest were not given freely or voluntarily and should be suppressed as a violation of his Fourth Amendment rights.

The Government responds that probable cause existed based upon corroborated information given by two cooperating defendants and the surveillance conducted by various law enforcement officers. At the hearing, the Government offered testimony of the following law enforcement

officers: DEA Task Force Agent Officer Resa Odom ("Odom") with the East Baton Rouge Sheriff's Department; Special Agent Tahariiq Gray ("Gray"); DEA Special Agent Keynavanh Sayasone ("Sayasone"); Officer Johnny Nance ("Nance") with the Mesquite Police Department; and Officer Josh Troquilte, ("Troquilte") with the Mesquite Police Department. All of the witnesses were involved in the investigation and arrest of Defendant. The Government offered into evidence seven photographs of evidence confiscated during the search of Defendant's vehicle and one audio compact disc that contained a series of phone calls made by Defendant to his source of methamphetamine.[1] Defendant called no witnesses and offered no exhibits into evidence.

*Officer Odom*

Odom testified that, in January 2009, she learned through a cooperating defendant that Defendant would travel to Dallas, Texas in a black BMW to purchase at least one pound of methamphetamine. She was told this would occur on a weekly to bi-weekly basis. The cooperating defendant stated that Defendant would be accompanied by a female and would travel to the area of Webb Chapel Road and Interstate 635 in Dallas, where the deal would take place in the parking lot of a Burlington Coat Factory or in a nearby subdivision. A second cooperating defendant informed Odom of the same information and stated that the female passenger traveling with Defendant would be Cindy Smith. Both cooperating defendants stated that the Defendant concealed the methamphetamine and money inside a nail gun. Odom testified that the two cooperating defendants knew each other, but they did not know the other was cooperating with authorities.

On the evening of February 22, 2009, surveillance was initiated on Defendant's apartment. At approximately 4:30 a.m. on February 23, 2009, the surveillance team observed a woman, later

---

[1] After arrest, Defendant cooperated with the DEA agents.

2

identified as Cindy Smith, being dropped off at Defendant's apartment. Defendant and Smith then went to a gas station and departed for Dallas, Texas. Odom and her surveillance team of four vehicles followed Defendant onto the highway. As they were en route to Dallas, Odom contacted Gray of the Dallas Field Division Office to let him know that they were en route to Dallas and told Gray about Defendant's pending warrants. The four vehicles maintained constant surveillance on Defendant from Baton Rouge, Louisiana, to Mesquite, Texas. Neither a search warrant nor an arrest warrant was ever sought prior to the departure for Texas.

Odom testified that the Mesquite Police Department took over the surveillance in Mesquite near Interstate 20 and Highway 80 because her team was not familiar with the area. After abandoning her surveillance, Odom proceeded to the Burlington Coat Factory parking lot and waited.

Once Defendant was arrested, Odom proceeded to the location where Defendant was stopped. When she arrived, Defendant was already in custody, and he had been advised of his rights. She explained to Defendant the details of the surveillance. At no time did Defendant ask for an attorney, and Defendant was not forced to speak to the police.

After the arrest, Odom went to the DEA office in Dallas for the processing of Defendant. At the DEA office, Defendant indicated that he wanted to continue to cooperate. He was not forced to cooperate nor was he promised anything for cooperating. During this time, Defendant never asked for an attorney or to terminate the conversation and agreed to make phone calls to his source. Defendant then called his source, a Hispanic male, who was eventually arrested.

*Special Agent Gray*

On or about February 22, 2009, Gray received a call from Odom regarding Defendant. On February 23, 2009, Odom advised Gray that Defendant was traveling to Dallas in a black BMW with

3

a female passenger and advised him that Defendant had warrants pending, but did not tell him the nature of the warrants.

Mesquite Police picked up the surveillance and Gray joined the surveillance around Interstate 635 and Webb Chapel Road. During the surveillance, there were approximately six to eight vehicles involved. Gray located Defendant's vehicle going into a neighborhood off of Forest Lane, and he proceeded to follow it from a distance. The vehicle slowed down and pulled into a driveway, so Gray pulled over on the side of the road.

The black BMW backed out of the driveway and continued down the street where the vehicle passed him as he was parked on the side of the road. Gray felt like this was a "heat run" or counter-surveillance practice by the Defendant.

After the vehicle passed, Gray continued in the opposite direction and, through radio communications, heard that the vehicle was back on Forest Lane about to turn on Webb Chapel Road. The radio communications indicated that the vehicle did not turn on Webb Chapel Road but swerved over and continued onto Forest Lane. The Defendant traveled to Harry Hines Boulevard and then proceeded to get onto Interstate 35. Gray backed off at this point, because he had passed Defendant's vehicle several times and did not want to alert Defendant to the surveillance.

Officers tried to stop the vehicle, but Defendant evaded the officers. Shortly thereafter, Defendant turned on a street that resembled a "horseshoe," which allowed officers to block the exit with their cars. When Gray arrived at the scene of the arrest, Defendant was sitting on the curb and Sayasone advised Defendant of his rights, using the DEA 13-A card. Gray conversed with the Defendant at the scene while the vehicle was being searched, and Defendant cooperated freely and never asked for an attorney.

4

After the arrest, all the agents and officers traveled to the DEA office where Gray continued his questioning of the Defendant. Gray testified that he did not force Defendant to give him any information nor did he promise him anything. Defendant told Gray that he would be willing to call his source. The phone calls that Defendant agreed to make were recorded, and Gray identified the voices on the audio compact disc offered by the Government as Exhibit Eight. Defendant told him that he noticed a Mustang, which was driven by Nance, on two different occasions during the surveillance. Defendant also told Gray that he was there to purchase one-and-a-half pounds of methamphetamine. Gray testified that he knows the process for obtaining a search warrant and that, based on his experience, they had enough probable cause to arrest Defendant and search his vehicle.

*Special Agent Keynavanh Sayasone*

Sayasone was present during the arrest of Defendant and assisted Troquilte in arresting Defendant. After Defendant was arrested, Sayasone read the Defendant his rights using the DEA 13-A card. A copy of the 13-A card was admitted into evidence. Sayasone did not ask Defendant any questions, but Gray began questioning the Defendant when he arrived on the scene two to three minutes after the arrest.

*Officer Johnny Nance*

Nance began surveillance of Defendant's vehicle on westbound Interstate 20 around the Highway 80 split. He followed Defendant all the way to Webb Chapel Road and the Interstate 635 area. The Defendant passed him approximately three times in what Nance observed to be "heat runs." Nance stated that Defendant's conduct was a counter-surveillance technique that was typical of people involved in drug transactions. Nance continued surveillance while the Defendant was traveling on Forest Lane towards Harry Hines Boulevard. During this time, he observed Defendant

5

commit numerous traffic violations. Defendant was eventually stopped and arrested on a "horseshoe" style street, and Defendant was taken into custody by Troquilte. Nance was not present when Defendant was read his rights, but he was informed that they were given. Nance arrested the passenger Smith. After the arrests, Nance and Troquilte searched the trunk of Defendant's vehicle. In the trunk they found a nail gun and were informed by one of the special agents from Louisiana that the nail gun might contain money or drugs. Nance and Troquilte utilized a tool found in the trunk to remove the back panel of the nail gun, and they found approximately $30,000 in United States Currency.

*Officer Josh Troquilte*

Troquilte first saw Defendant's vehicle at the Interstate 20 and Highway 80 split. He followed Defendant to the area of Interstate 635 and Webb Chapel Road. Once arriving in this area, Troquilte set up in a neighborhood and observed Defendant twice in what he felt were "heat runs." At this point, he proceeded to a shopping center to set up his surveillance. Troquilte proceeded to follow Defendant as he left the area of Forest Lane and Webb Chapel Road.

The decision was made to stop Defendant due to the outstanding warrants and his involvement in drug trafficking. Troquilte rolled down his window and flashed his badge at Defendant and yelled for him to pull over. Defendant went onto the curb to avoid Troquilte's vehicle, and Defendant almost struck Troquilte's vehicle. Troquilte quickly recovered and rejoined the surveillance of Defendant. Upon rejoining the surveillance, Troquilte testified that he followed Defendant down a "horseshoe" street, where Defendant was subsequently blocked in by other agents. Once Defendant was pulled over, Troquilte placed Defendant under arrest and put handcuffs on him. Within a few minutes after the arrest, Troquilte and Nance proceeded to search Defendant's vehicle.

Troquilte believed that they had probable cause to arrest Defendant and search Defendant's vehicle.

**ANALYSIS**

Defendant argues that the stop of his vehicle, his arrest, and the subsequent search of his vehicle were unconstitutional and therefore any and all evidence seized in connection with the arrest should be suppressed. Defendant alleges that law enforcement did not have a warrant to make the arrest and should have obtained a warrant long before the arrest was made, which makes the arrest unlawful. Defendant also argues that law enforcement did not have probable cause to detain Defendant and to subsequently search his vehicle. According to Defendant, he did not consent to the search of his vehicle, and no exception to the requirement of a search warrant exists. Additionally, Defendant alleges that all statements given after the search of his vehicle were not made freely or voluntarily and should be suppressed.

The Government argues that the arrest of Defendant and the search of his vehicle were proper under the "automobile exception" to the Fourth Amendment, because at the time of the arrest and search of Defendant's vehicle, law enforcement officers had probable cause to believe that the vehicle contained evidence of the offense of arrest. In regard to Defendant's statements made to law enforcement officers, the Government argues that Defendant made the statements freely, knowingly and voluntarily, and Defendant's statements should be admissible at trial.

*Evidence Obtained from Defendant's Car*

Defendant argues that his arrest and the subsequent search of his vehicle violated his Constitutional rights under the Fourth Amendment, because law enforcement made the arrest and search without a warrant and without probable cause. The Fourth Amendment ensures that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches

7

and seizures, shall not be violated." U.S. Const. amend. IV. The warrantless search of an area in which the Defendant has a privacy interest is per se unreasonable, unless the Government can show that an exception applies. *Katz v. United States*, 389 U.S. 347, 357 (1967). Fourth Amendment jurisprudence recognizes several warrant exceptions. The Supreme Court held that an officer may perform a warrantless search of a home incident to arrest, so long as the search is limited to the area within the arrestee's "immediate control," which means "the area from within which he might gain possession of a weapon or destructible evidence." *Chimel v. California*, 395 U.S. 752, 763 (1969). The Supreme Court applied the holding in *Chimel* to occupants of automobiles in *New York v. Belton*, 453 U.S. 454 (1981). The Court held that an officer who arrests "the occupant of an automobile...may, as a contemporaneous incident of that arrest, search the passenger compartment of the automobile" and any containers found inside. *Id.* at 460.

In support of his motion to suppress evidence, Defendant relies upon the recent Supreme Court decision of *Arizona v. Gant*, 129 S.Ct. 1710 (2009). In *Gant*, officers arrested a driver for a suspended license, handcuffed him, and placed him in the back of a police car. Officers searched the interior of the car that the arrestee had exited, uncovering a gun and a bag of cocaine. *Id*. at 1714-16. In holding that this search violated the Fourth Amendment, the Supreme Court rejected a broad interpretation of *Belton* that would permit a search of the entire passenger compartment of a vehicle with no regard to whether the interior compartment was actually accessible to the arrestee at the time of the search. *Id*. at 1719. Instead, the warrant exception described in *Chimel* only applies to an officer "search[ing] a vehicle incident to a recent occupant's arrest...when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search." *Id*. The Court noted that under this rule, "it will be the rare case in which an officer is unable to fully effectuate an

arrest so that a real possibility of access to the arrestee's vehicle remains." *Id*. at 1719 n. 4 (citation omitted).

Defendant argues that, under *Gant*, the search incident to arrest exception did not validate a warrantless search during and after his arrest. Defendant bases this argument on the fact that, during the search of his vehicle, he was already under arrest and had no access to his vehicle or its contents. According to the testimony provided at the motion hearing, Defendant was handcuffed and several officers were on the scene when the search of his vehicle took place. Following the reasoning in *Gant*, a reasonable officer could not consider Defendant capable of accessing his vehicle at the time the search was conducted, which would not validate a warrantless search.

The Government argues, and the Court agrees, that while *Gant* limits the search incident to arrest exception, *Gant* also affirmed the viability of the probable cause exception for automobiles. *Id*. at 1719. When searching a vehicle without a warrant, "a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained." *United States v. Ross*, 456 U.S. 798, 809 (1982). "An individual's expectation of privacy in a vehicle and its contents may not survive if probable cause is given to believe that the vehicle is transporting contraband." *Id*. at 823. "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *Id*. at 825. In *Gant*, the Supreme Court notes that "*Ross* allows searches for evidence relevant to offenses other than the offense of arrest, and the scope of the search authorized is broader." *Gant*, 129 S.Ct. at 1721. Therefore, if the law enforcement officers had probable cause, then Defendant's motion to suppress should be denied.

Probable cause is defined as "whether at that moment the arrest was made, the officers

had...facts and circumstances within their knowledge and of which they had reasonably trustworthy information that was sufficient to warrant a prudent man in believing that [Defendant] had committed or was committing an offense." *Charles v. Smith*, 894 F.2d 718, 723 (5th Cir. 1990) (quoting *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964)). "The existence of probable cause is determined by reviewing the totality of the circumstances." *United States v. Antone*, 753 F.2d 1301, 1304 (5th Cir. 1985) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

The Court finds that the law enforcement officers had probable cause to arrest Defendant and search Defendant's vehicle, including the trunk of the vehicle, and the nail gun found in the trunk of the vehicle. The facts here are similar to the facts in *Ross*, and the Court finds that the same reasoning allowing a legal search in that case allows the search of Defendant's vehicle. In *Ross*, the Supreme Court held that officers had probable cause to search the trunk of arrestee's vehicle without a warrant after they arrested him for dealing narcotics, because a reliable informant gave a detailed description of arrestee's narcotics sales and a detailed description of arrestee's vehicle which was used during the narcotics sales. *See Ross*, 456 U.S. at 800.

Here, the officers who participated in the investigation, surveillance, arrest, and search of Defendant's vehicle had probable cause to believe that United States currency intended for the purchase of methamphetamine was in Defendant's vehicle. A review of the totality of the evidence, including the collective knowledge and experience of all of the officers involved, indicates that the arresting officers received reliable information from other officers who had reasonable suspicion to believe that the vehicle contained evidence of drug trafficking. Officer Odom testified that two different informants verified that Defendant participated in the trafficking of methamphetamine from Texas to Louisiana. The informants, who did not know that the other was speaking to authorities,

told Odom the specific way in which Defendant would hide money or narcotics in a nail gun in the trunk of his vehicle. The informants also described the vehicle that Defendant would use for the narcotics transaction, when he would leave, who he would travel with[2], and where he would travel.

Through surveillance of Defendant, law enforcement was able to corroborate much of what the informants were telling them. Just as the informants suggested, Defendant and a woman traveled in a black BMW towards Dallas on Interstate 20. The Defendant traveled to an area near Webb Chapel Road and Forest Lane, which corroborated where the informants said Defendant would likely receive the methamphetamine. Several of the officers conducting the surveillance of Defendant testified that Defendant conducted several "counter-surveillance" techniques, such as parking in driveways to see if anyone was following him. According to the officers, such techniques are consistent with drug trafficking. Finally, Defendant led officers on a high speed chase through neighborhoods, breaking several traffic laws, in an attempt to avoid surveillance and arrest. The behavior of the Defendant corroborated the information provided by the informants and gave the officers probable cause to believe that Defendant's vehicle contained currency that would be used to purchase methamphetamine. Because officers had probable cause to search Defendant's vehicle, Defendant's motion to suppress evidence should be denied.

Defendant's argument that officers should have obtained a warrant once they believed Defendant was participating in narcotics trafficking is unfounded. "A defendant has no constitutional right to be arrested at the point when either he or the Court deems that there is sufficient probable cause for arrest." *U.S. v. Adekunle*, 2 F.3d 559, 561 (5th Cir. 1993) (citing *U.S.*

---

[2] The first cooperating defendant advised that Defendant would travel with a woman. The second cooperating defendant told authorities this woman would be Cindy Smith.

*v. Hoffa*, 385 U.S. 293, 310 (1966)). "Law enforcement officials are 'not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect." *Id*. Law enforcement acted lawfully in arresting Defendant. Therefore, Defendant's motion to suppress should be denied.

***Statements Made by Defendant***

Defendant argues that his statements made while in custody were involuntary and should be suppressed. The Due Process Clause of the Fifth Amendment guarantees that no person shall be deprived "of life, liberty, or property, without due process of law." U.S. Const. amend. V. Pursuant to due process, statements of Defendant may be deemed "involuntary" when obtained through official coercion. The Fifth Amendment protects an individual's right to be free from compelled self-incrimination, thus, the Government may use at trial only those confessions that are voluntarily made. *Malloy v. Hogan*, 378 U.S. 1, 6 (1964). In order for the Government to introduce Defendant's statement, it generally must prove that the accused voluntarily, knowingly and intelligently waived his *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436 (1966). To prove a valid waiver, the Government must show that the relinquishment of the defendant's rights was voluntary and the defendant was fully aware that the right was being waived and the consequences of waiving that right. *Id.*

As discussed above, Agent Sayasone testified that he read Defendant his *Miranda* rights from DEA Form 13-A, immediately after Defendant was removed from his vehicle and handcuffed. The Government offered a copy of Form 13-A into evidence. According to the testifying officers, Defendant was read his rights, never requested to speak to an attorney, and spoke to them freely and without coercion. Defendant offered no testimony or evidence to the contrary. Therefore, the Court

finds that Defendant waived his *Miranda* rights and cooperated with authorities freely, and Defendant's motion to suppress oral statements given subsequent to his arrest should be denied.

**RECOMMENDATION**

The Court recommends that Defendant's Motion to Suppress should be DENIED.

Upon agreement of the parties, within five (5) days after service of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C. § 636(b)(1)(c).

Failure to file written objections to the proposed findings and recommendations contained in this report within five days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).

**SIGNED this 1st day of July, 2009.**

_____
AMOS L. MAZZANT
UNITED STATES MAGISTRATE JUDGE